UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. 09-cr-00303 |
| VERSUS | JUDGE WALTER |
| ANTHONY WAYNE LEE | MAGISTRATE JUDGE HORNSBY |

### REPORT AND RECOMMENDATION

**Introduction**

Before the court is Defendant's **Motion to Suppress (Doc. 25)**. For the reasons that follow, it is recommended that Defendant's motion be **denied**.

**The Facts**

An evidentiary hearing was held on March 3, 2010. The evidence at the hearing establishes the following facts. Agent Lee J. Scott, an experienced narcotics officer with the Shreveport Police Department and a former member of the DEA Task Force, received a tip from a confidential informant ("CI") on November 6, 2009 concerning an upcoming shipment of cocaine from Dallas to Shreveport. Specifically, the CI told Scott that an individual identified as "Big Man" was bringing a large amount of cocaine from Dallas to an individual named "Big Mike" in Shreveport. According to the CI, "Big Man" would be driving a green Chrysler 300 with a bullet hole in the access door to the gas tank. The CI also told Scott that two young males would be traveling with "Big Man" in the vehicle.

Scott was very familiar with this CI, having used the informant many times over the last eight to ten years. Scott had always found this CI's tips to be reliable, and the tips had been the basis of numerous arrests.

Scott received another call from the CI on November 7, 2009 (the next day). In that call, the CI notified Scott that "Big Man" had left Dallas to deliver the drugs to Shreveport.

Agent Scott contacted Agents Greg Walker and Joel Sharpley of the Shreveport-Caddo Narcotics Task Force and requested their assistance. Walker and Sharpley set up surveillance on the eastbound side of Interstate 20 near the Texas-Louisiana border. When they saw the green Chrysler 300 with a bullet hole as described by the CI, Walker and Sharpley followed the car. Walker contacted Scott, who told Walker not to stop the car unless Walker developed his own probable cause to do so.

Scott asked Walker to run the license plate number, because Scott wanted to learn the identity of the driver. When Walker ran the license plate number, he learned that the license plate (a copy of which was admitted as Government Exhibit 1) had been canceled. Walker then activated his emergency lights and initiated a traffic stop.

Walker and Sharpley removed Defendant and the two young male passengers from the car. The three men were patted down and placed into handcuffs for officer safety. Agent Scott arrived on the scene a couple of minutes later.[1] Scott greeted Defendant by referring

---

[1] Walker and Sharpley were in an unmarked narcotics vehicle with emergency lights. The vehicle was not equipped with a dash camera or other recording device. However, Agent Scott was carrying a portable tape recorder which recorded his interactions with Defendant and the two passengers. A disk containing the audio recording was admitted into evidence as Government Exhibit 4.

to him as "Big Man," which Defendant acknowledged. At that point, Scott felt sure that he was talking to the same person that was the subject of the CI's tip.[2] Either Walker or Sharpley told Scott that Defendant had already consented to a search of the car.[3] At that point, however, no search of the car had been conducted.

Scott asked Defendant about his itinerary, whether he had any outstanding warrants, and why the license plate on the vehicle had been canceled. Scott asked Defendant for permission to search the car, but Defendant, at least initially, did not immediately give Scott consent. When Defendant asked Scott why the officers wanted to search his car, Scott responded that he had received information that Defendant was transporting a large amount of cocaine from Dallas to Shreveport. Scott explained that his job was to attempt to confirm or verify that information. Scott also told Defendant that a canine was already in route to the scene.[4]

After discussing those matters with Defendant, Scott again asked Defendant if he minded if the officers searched the car. Scott told Defendant that the request called for a yes or no response. Defendant, however, did not give a yes or no response at that time.[5] Scott

---

[2] Defendant's drivers' license identified him as Anthony Lee. Scott was familiar with that name because it had come up in prior DEA and FBI investigations concerning Lorenzo Jackson and Willie Lee.

[3] There was no testimony at the hearing about that consent, and the Government does not appear to rely on that consent as a basis for the subsequent search.

[4] Scott requested a canine officer as soon as he learned that the traffic stop had been made.

[5] During closing arguments at the suppression hearing, Defendant's counsel represented that, over the course of their conversations, Scott asked Defendant at least five times for consent to search Defendant's car. As explained later, only in response to the final request did Defendant

then told Defendant that, because the license plate on his car had been canceled, the officers were going to impound the car anyway. Moreover, Defendant's insurance was expired, and he had no registration for the car.

The audio recording reflects that Scott asked (again) for consent to search Defendant's car. Audio 9:36. Specifically, Scott asked: "Do you mind if we search the vehicle?" Defendant responded "No, sir." Scott then asked Defendant whether he was consenting to the search based on his own free will. Defendant responded in the affirmative. Scott responded that he would wait to search the car until the canine arrived. However, Scott told Defendant that, "The truth can go a long way with me," and he asked Defendant if there was anything in the car that should not be there. Defendant responded that there was not. Scott then did a quick look inside the vehicle to make sure no guns were present.

The audio recording reflects that, a few minutes later, Defendant questioned Agent Scott why the traffic stop was made. Scott again explained the confidential information he had received as well as the canceled license plate. Defendant stated that he "saw no reason" for Scott to want to search the vehicle, and Defendant asked whether, if the officers found nothing in the vehicle, he would be free to go. Scott told Defendant that he would probably receive citations for the canceled plate.

---

give consent to the search.

Scott and Defendant then engaged in a conversation regarding Defendant's phone calls while driving from Dallas to Shreveport.[6] Defendant stated that he did not "clear his calls" from his phone, and he volunteered that Scott could look at his cell phone. Scott looked through Defendant's contact list and saw several names that Scott associated with illegal drug trafficking.

Officer Dailey and his canine arrived on the scene within about 30 minutes of the initial traffic stop. Dailey ran his dog around the outside of the car, and the canine alerted in the area of the trunk. The officers opened the trunk and found a bag of clothes that belonged to one of the passengers. No drugs or contraband were discovered in the trunk, although only a cursory search was done at that time.[7]

Agent Scott decided to move Defendant's vehicle from the side of the road to the Shreveport Police Station to conduct a more thorough search. Traffic was exceptionally heavy on the interstate, and a television news crew had arrived on the scene unexpectedly. Scott was concerned about the safety of everyone involved. He was also concerned about the news media videotaping the incident if Defendant decided that he wanted to cooperate with the Government in the investigation of others.

---

[6] Scott had talked to one of the passengers, Cortez Lewis, who told Scott that he overheard Defendant talking on his cell phone about "having the white," which Lewis understood to be a reference to drugs. Scott told Defendant what Lewis had reported, but Defendant stated that the only calls he made were to his girlfriend.

[7] It is unclear whether the canine ever entered the passenger compartment of Defendant's car. Agent Walker testified that it did, but Agent Scott did not recall that.

Defendant, his two passengers, and his car were moved to the Shreveport Police Department. A more thorough search of the inside of the car was conducted, and powder and crack cocaine were located in the storage area of the center console. See photographs introduced as Government Exhibits 2 and 3.

Defendant was advised of his Miranda rights, and an interview was attempted. Defendant asserted his right to counsel, and the interview was stopped. Before leaving the interview room, however, Defendant stated (without any question or prompt from law enforcement) that the passengers did not know anything about what was inside the vehicle, and that all of the cocaine belonged to him.

**Defendant's Arguments**

Defendant's Motion to Suppress argues that his consent to the search of his car was not voluntary. Defendant points out that Agent Scott requested Defendant's consent at least five times before Defendant granted consent, and that Defendant was handcuffed during the entire stop. Defendant also argues that the search of the car exceeded the scope of Defendant's consent and what was reasonably necessary under the circumstances. Defendant maintains that his consent did not include consent to moving the car from the side of the road to the Shreveport Police Department for a more thorough search.

**Law Regarding Traffic Stops**

The legality of a traffic stop is analyzed under the framework articulated in Terry v. Ohio, 392 U.S. 1 (1968); United States v. Brigham, 382 F.3d 500, 506 (5th Cir. 2004)(en banc). Under the two-part Terry reasonable suspicion inquiry, the court must determine

whether the officer's action was: (1) "justified at its inception"; and (2) "reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 19-20; Brigham, supra at 506-507; U.S. v. Lopez-Moreno, 420 F.3d 420, 429-434 (5th Cir. 2005).

**The Initial Stop**

For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle. See United States v. Breeland, 53 F.3d 100, 102 (5th Cir.1995). In making a reasonable suspicion inquiry, a court "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. 266, 273 (2002); United States v. Cortez, 449 U.S. 411, 417 (1981). An officer may stop a motorist for a traffic violation even if, subjectively, the officer's true motive is to investigate unrelated criminal offenses. United States v. Lenz, 162 Fed. Appx. 379, 382 (5th Cir. 2006).

Defendant does not seriously dispute that the traffic stop was justified at its inception. Agent Scott had reasonable suspicion that Defendant was transporting cocaine. Moreover, the evidence established that the license plate on Defendant's vehicle had been canceled. Accordingly, the traffic stop was justified at its inception.

**Continued Detention**

As for the second prong of the Terry inquiry, generally, the "detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges." Brigham, 382 F.3d at 507. In the course of effectuating the stop, a police officer may permissibly examine the driver's license and registration and run a computer check on them to investigate whether the driver has any outstanding warrants and if the vehicle is stolen. Id. at 507-08. An officer may also ask the driver about the purpose and itinerary of his trip. Id. at 508. Indeed, the officer's questions need not even be related to the purpose of the traffic stop, since "[d]etention, not questioning, is the evil at which Terry's second prong is aimed." Id.

Although an officer's inquiry may be wide-ranging, once all relevant computer checks have come back clean, there is no more reasonable suspicion, and, as a general matter, continued questioning thereafter unconstitutionally prolongs the detention. Brigham, 382 F.3d at 510. See also Santiago, 310 F.3d 336, 341-42 (5th Cir. 2002); United States v. Jones, 234 F.3d 234, 241 (5th Cir. 2000); United States v. Dortch, 199 F.3d 193, 200 (5th Cir.1999), *corrected on denial of rehearing*, 203 F.3d 883 (5th Cir. 2000).

A recognized exception to this rule is that if additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed. See Brigham, 382 F.3d at 507; United States v. Grant, 349 F.3d 192, 196 (5th Cir. 2003); U.S. v. Jenson, 462 F.3d 399, 404 (5th Cir. 2006). However, mere "uneasy feelings" and

inconsistent stories between a driver and passenger do not constitute articulable facts that support a reasonable suspicion of drug trafficking. U.S. v. Estrada, 459 F.3d 627, 631 (5th Cir. 2006).

The agents did not unreasonably extend the traffic stop in order to obtain Defendant's consent to search. Based on the CI's information, Agent Scott had reasonable suspicion to believe that Defendant was transporting cocaine from Dallas to Shreveport. At the time they initiated the traffic stop, Agents Walker and Sharpley also had reasonable suspicion that Defendant was transporting cocaine. See United States v. Carmenate, 2009 WL 2998568 (5th Cir. 2009)(collective knowledge supported reasonable suspicion for traffic stop); United States v. Cortez, 2008 WL 5068619 (5th Cir. 2008)(collective knowledge of officers provided reasonable suspicion and justified continued detention while the officers waited for canine to arrive); United States v. Sanchez, 199 F.3d 753, 759 (5th Cir. 1999).

Defendant consented to the search of his vehicle less than 10 minutes after Agent Scott arrived on the scene. A few minutes later, Defendant consented to the search of his cell phone. The canine alerted on Defendant's vehicle within about 30 minutes of the initial stop. Thus, the agents acted promptly to resolve their reasonable suspicion that Defendant was transporting drugs.

**Voluntariness of Defendant's Consent**

The Government bears the burden of proving that Defendant's consent was free and voluntary. United States v. Kelley, 981 F.2d 1464, 1470 (5th Cir. 1993). In determining whether a consent to search is voluntary, the Fifth Circuit reviews several factors, no one of

which is dispositive. These factors include: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of her right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found. United States v. Jenkins, 46 F.3d 447, 451 (5th Cir. 1995). An analysis of these factors shows that Defendant's consent to the search was voluntary.

With respect to the first factor, Defendant makes much of the fact that he was handcuffed during the entire encounter. However, Defendant and two passengers were handcuffed at the time of the initial stop because only two officers were present at that time. Defendant was not under arrest at the time he gave consent, although he was detained and not free to leave.

With regard to the second factor, the presence of coercive police procedures, none of the agents coerced Defendant into consenting to the search of the vehicle or the cell phone. The recording shows that Agent Scott was very professional and cordial to Defendant throughout the encounter. There is no indication that Defendant was intimidated by the officers. Rather, he engaged them in discussions in a comfortable manner.

With regard to the third factor, Defendant remained cooperative and conversational with the agents, and he showed no signs of distress or other unpleasantness. The audio recording shows that Defendant even volunteered that Agent Scott could examine his cell phone. Audio 23:00.

With regard to the fourth factor, Defendant was aware that he did not have to consent to the search. In fact, Defendant did not give his consent to Agent Scott immediately. Once Defendant consented, Agent Scott questioned Defendant to make sure that Defendant's consent was free and voluntary.

As to the fifth factor, Defendant's education and intelligence, Defendant's conversations with the officers suggests at least an average level of intelligence.

Regarding the final factor, Defendant's belief that no incriminating evidence will be found, the cocaine was found in the center console. It was not hidden. Defendant probably believed that the drugs would likely be found by the agents or the canine.

Based on all of the circumstances, including the recorded conversation between Agent Scott and Defendant, the undersigned finds that Defendant freely and voluntarily consented to a search of his vehicle and cell phone. Some factors, such as custodial status and knowledge that the drugs would be found, perhaps weigh in Defendant's favor, but a careful consideration of all of the facts shows that Defendant's consent was free and voluntary.

**Canine Alert**

Even setting aside the issue of consent, once the canine alerted, the agents had probable cause to search the vehicle. United States v. Campos, 237 Fed.Appx. 949, 954 (5th Cir. 2007).

**Scope/Location of the Search**

Defendant complains that the agents moved his car to the police station for a more thorough search. However, where the police have probable cause to search a vehicle on the

side of the interstate, they may also perform a more thorough search at the station. United States v. Romero, 2010 WL 607000, fn. 1 (5th Cir. 2010). And even if the search was based on consent alone, there is no evidence that Defendant objected to moving his vehicle to a safer location for the search. United States v. Gonzalez-Basulto, 898 F.2d 1011, 1013 (5th Cir.1990) (a defendant's failure to protest may be considered as evidence that the search did not exceed the scope of consent). Given the volume of traffic at the time of the stop and the unexpected arrival of a television news crew, the agents acted appropriately in moving the vehicle to the police station in order to complete the search.

**Inevitable Discovery**

There is an alternative basis to uphold the search of the vehicle. Defendant did not have proper vehicle registration or proof of insurance. Accordingly, the agents were required to impound Defendant's vehicle. See La. R.S. 32:863.1(C)(1)(a)(vehicle shall be impounded if the operator cannot provide proof of insurance). Agent Scott testified that it is his department's policy to impound a vehicle if the driver cannot produce evidence of insurance. The cocaine would inevitably have been discovered when the agents conducted an inventory pursuant to impounding the vehicle. United States v. Swan, 259 Fed.Appx. 656, 661 (5th Cir. 2007).

**Conclusion**

The evidence shows that Defendant freely and voluntarily consented to a search of his vehicle and cell phone. Once the canine alerted on the vehicle, the agents had probable cause to search it. Alternatively, the cocaine would have been found when the agents inventoried

the contents of the vehicle during the impound process. Defendant's subsequent statement (at the police station) regarding his ownership of the drugs was made voluntarily following a knowing and voluntary waiver of Defendant's Miranda rights.

Accordingly;

IT IS RECOMMENDED that Defendant's Motion to Suppress (Doc. 25) be denied.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Crim. P. 59(b)(2), parties aggrieved by this recommendation have **fourteen (14) days** from the date of this Report and Recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 45(b). A party may respond to another party's objections within **seven (7) days** from the filing of the objections. Counsel are directed to furnish a paper courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file timely written objections to the proposed findings, conclusions and recommendation set forth above shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

Shreveport, Louisiana, this 9th day of March, 2010.

MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE